# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# JONESBORO DIVISION

SHEILA DENISE TANNER                                              PLAINTIFF


v.                              NO. 3:15-cv-00129 PSH


CAROLYN W. COLVIN, Acting Commissioner                           DEFENDANT
of the Social Security Administration


## MEMORANDUM OPINION AND ORDER

Plaintiff Sheila Denise Tanner ("Tanner") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Tanner maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole.[1] Specifically, Tanner maintains that her residual functional capacity was not properly assessed and offers three reasons why. She first maintains that "the record does not support a finding that [she] can stand and/or walk for six hours in an eight-hour workday." See Document 11 at 25.

---

[1]     The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of assessing the claimant's residual functional capacity, the ALJ is required to evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ does so by considering the medical evidence and evidence of the claimant's "daily activities; duration, frequency, and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." See Id. at 1218 [citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)].

The medical evidence relevant to Tanner's ability to stand and/or walk reflects that she occasionally complained of leg and back pain between January of 2011 and April of 2012. See Transcript at 460-464 (01/28/2011), 464-467 (05/23/2011), 529-532 (04/27/2012). For instance, in April of 2012, she presented to a medical clinic complaining of, inter alia, pain and swelling in her left leg. See Transcript at 529. She represented that the pain and swelling had persisted for one month. An advanced practice nurse confirmed the swelling in Tanner's leg and noted that the skin on Tanner's leg was pink, warm, and dry. It is not clear from the progress note what caused her leg to swell. The advanced practice nurse diagnosed diabetes, hypertension, and hyperlipidemia and prescribed medication.

In May of 2012, Dr. Roger Troxell, M.D., ("Troxell") saw Tanner for a consultative examination. See Transcript at 487-491. Troxell recorded Tanner's complaints of, inter alia, chronic pain in her cervical spine and problems with her lumbar spine. An orthopedic examination revealed that she had bone spurs, but Troxel observed that Tanner had an unlimited range of motion in her back and extremities, no muscle spasms, negative straight leg raises, no muscle weakness, and no muscle atrophy. Although he observed that her gait was slow and unsteady, he observed that she could stand/walk without assistive devices, walk on her heels and toes, and squat/arise from a squatting position. He diagnosed, inter alia, lumbar spondylosis and fibromyalgia and opined that she had a moderately decreased ability to walk.

In June of 2012, Dr. Samuel Hester, Ph.D., ("Hester") saw Tanner for a mental diagnostic evaluation. See Transcript at 496-504. Although Hester diagnosed a pain disorder associated with medical and psychological factors, he opined, inter alia, that Tanner could tend to her basic self care needs and could complete work-like tasks within an acceptable timeframe unless the tasks exacerbate her pain issues.

In September of 2013, Tanner presented to a hospital complaining of left-side weakness and a headache. See Transcript at 590-619. She was diagnosed with, inter alia, acute right hemispheric infarction and left-side weakness. She was prescribed medication and told to take aspirin. When Tanner saw Dr. Dawn Brown, M.D., the following month, the left-side weakness and headache were characterized as a stroke. See Transcript at 632. Tanner, though, showed no serious residuals and was doing well.

The non-medical evidence relevant to Tanner's ability to stand and/or walk is contained, in part, in a pain form, a function report, and a work history report she completed in connection with her application for supplemental security income payments. See Transcript at 398-399 (pain form), 400-407 (function report), 410-417 (work history report). In the pain form, she represented that she had been suffering from fatigue for approximately twelve years. She represented that she experiences pain all over her body, all day long. The pain is caused by typical work-related activities. Tanner represented that she can stand and walk for only about five to ten minutes before she experiences pain and can sit for only about fifteen minutes before she experiences pain. She requires a nap or rest at least twice or more a day for between thirty to sixty minutes at a time.

In the function report, Tanner represented that a typical day consists of getting up, making coffee, taking medication, watching television, doing dishes, tending to clothing, helping prepare supper, and going back to bed. She has difficulty attending to her personal care and cannot prepare her own meals but can do some housework.

In the work history report, Tanner represented that she has past work as a dishwasher, housekeeper, a "polly packer/tacker," and food service worker. See Transcript at 410. The periods of time she worked those jobs is not clear from the work history report. A summary of her FCIA earnings reflects, though, that for the period between 1979 and 2013, she only had three years during which she made more than $10,000.00, those years being 2001, 2002, and 2003. See Transcript at 378, 379-383.

Tanner testified during the administrative hearing, and her testimony largely conformed to the representations made in her disability documents. See Transcript at 268-306. She testified that she takes prescription medication but does so only for her mental impairments and diabetes. It appears that she only takes aspirin for her pain.

The ALJ found at step two of the sequential evaluation process that Tanner's severe impairments include diabetes mellitus, hypertension, hyperlipidemia, lumbar spondylosis, fibromyalgia syndrome, and a "pain disorder associated with medical and psychological factors." See Transcript at 250. He assessed her residual functional capacity and found that she is capable of standing and/or walking for up to six hours in an eight hour workday. In making that finding, the ALJ accorded some weight to Troxel's findings and observations. The ALJ accorded little weight to Troxel's opinion that Tanner has a moderately decreased ability to walk. The ALJ discounted that opinion because Troxel was not a treating physician, his opinion appears to have been based solely upon Tanner's self-reports, and Troxel's opinion was inconsistent with his own findings and observations.

Substantial evidence on the record as a whole supports the ALJ's finding that Tanner is capable of standing and/or walking for up to six hours in an eight hour workday. Although one of the reasons the ALJ gave for discounting a portion of Troxel's opinion is not compelling, the record as a whole does not indicate that Tanner has a standing and/or walking limitation greater than that found by the ALJ. The Court so finds for two reasons.

-5-

First, the medical evidence is minimal and unremarkable. The record indicates that Tanner sought medical attention for her leg and back pain on very few occasions, e.g., January of 2011, May of 2011, and April of 2012.[2] With respect to the nature of the medical evidence, it indicates that she has experienced pain and swelling in her leg and her gait is slow and unsteady. Otherwise, she has an unlimited range of motion in her back and extremities, can stand/walk without assistive devices, can walk on her heels and toes, and can squat/arise from a squatting position.

Tanner maintains that the ALJ improperly discounted Troxel's opinion regarding Tanner's ability to stand and/or walk. Admittedly, one of the reasons the ALJ gave for discounting the opinion, i.e., Troxel was not a treating physician, is not compelling.[3] The ALJ could and did, though, properly discount the opinion because it was based, at least in part, upon Tanner's self-reports. The ALJ could and did also discount the opinion because it is inconsistent with Troxel's own findings and observations, i.e., Troxel observed that Tanner has an unlimited range of motion in her back and extremities, can stand/walk without assistive devices, can walk on heels and toes, and can squat/arise from a squatting position.

---

[2]

Tanner saw Troxell in May of 2012 and Hester in June of 2012, but both examinations were at the direction of the state agency and in connection with Tanner's claim for benefits. Tanner sought medical attention in September of 2013, but it was for her complaints of left-side weakness and a headache. Tanner attributes her lack of medical care to her inability to pay for such care, but she has failed to show that she was unable to afford appropriate medical care. See Carrigan v. Astrue, 2009 WL 734116 (W.D.Ark. 2009) (Bryant, J.)

[3]

Troxel performed a consultative examination at the direction of the state agency. By definition, he was not a treating physician.

Second, the non-medical evidence relevant to Tanner's ability to stand and/or walk is capable of more than one acceptable characterization, and the characterization made by the ALJ was not improper.[4] The ALJ considered that Tanner's daily activites were only moderately limited, specifically crediting Hester's finding that Tanner can tend to her basic self-care needs, drive an automobile, and shop. The ALJ also considered that medication helps control Tanner's pain. He considered her representations regarding aggravating factors and functional limitations. With respect to her representation that she can only stand/walk for only about five to ten minutes before she experiences pain, he could and did observe that no physician "placed this level of limitation upon [her] and there are no clinical findings in the record that corroborate this extreme limitation." See Transcript at 256. The ALJ also considered Tanner's work history and observed that it raised a question whether her continued unemployment was actually due to her medical impairments. See Transcript at 256-257.

Tanner offers a second reason why her residual functional capacity was not properly assessed. She notes that the assessment of her residual functional capacity contained a limitation to frequent fingering and handling in her non-dominant upper extremity but otherwise contained no limitation for fingering and handling. She maintains that the limitation is inconsistent with her carpal tunnel syndrome and tremors, impairments the ALJ accepted as severe.

---

[4]

The ALJ noted his obligation to consider Tanner's subjective complaints, and he correctly articulated the prevailing standard for considering her complaints, i.e., Polaski v. Heckler.

The medical evidence relevant to Tanner's ability to finger and handle reflects that she occasionally complained of pain in her right hand and wrist and complained of tremors or "shakes" in her bilateral upper extremities. See Transcript at 450-452 (07/07/2010), 464-467 (05/23/2011), 545-547 (11/26/2012), 540-544 (02/04/2013), 568-570 (03/06/2013), 623-625 (01/08/2014). She complained that the pain caused her to drop things. It does not appear that the cause of her pain and tremors was ever identified, although the record contains speculation that they were caused by her poor eating habits. See Transcript at 570. No meaningful treatment was recommended or followed, save one recommendation that she use a splint and take medication.

When Troxell saw Tanner in May of 2012, he recorded her complaints to include right carpal tunnel syndrome without treatment. He observed, though, that she had an unlimited range of motion in her hands and wrists, no tremors, and a normal grip strength. He also observed that she could hold a pen and write, touch fingertips to palm, oppose thumb to fingers, and pick up a coin. He diagnosed, inter alia, carpal tunnel syndrome in her right hand and opined that she had a moderately decreased ability to handle.

The non-medical evidence relevant to Tanner's ability to finger and handle is contained, in part, in a pain form and a function report. See Transcript at 398-399 (pain form), 400-407 (function report). She represented in the forms that the pain in her hands makes it difficult to place them on a table and prevents her from doing such things as making crafts and holding a telephone for any length of time.

-8-

Tanner testified during the administrative hearing that she is left-handed. <u>See</u> Transcript at 309. She testified that she cannot work because of, <u>inter alia</u>, her tremors and the "carpal tunnel in both of [her] wrists," <u>see</u> Transcript at 277, but acknowledged that she had never been formally diagnosed with carpal tunnel syndrome in her left hand, <u>see</u> Transcript at 282-283, 301.

The ALJ found at step two of the sequential evaluation process that Tanner's severe impairments include "carpal tunnel syndrome right" and "essential and other unspecified forms of tremor." <u>See</u> Transcript at 250. He assessed her residual functional capacity and found that she is limited to frequent fingering and handling in her non-dominant upper extremity, <u>i.e.</u>, her right hand, but otherwise has no limitation in her ability to finger and handle. In making that finding, the ALJ accorded some weight to Troxel's findings and observations but gave little weight to Troxel's opinion that Tanner has a moderately decreased ability to handle. The ALJ discounted Troxel's opinion because Troxel was not a treating physician, his opinion appeared to have been based solely upon Tanner's self-reports, and Troxel's opinion was inconsistent with his own findings and observations.

Substantial evidence on the record as a whole supports the ALJ's finding that Tanner is limited to frequent fingering and handling in her right hand but has no fingering and handling limitation in her left hand. The ALJ could find as he did as the record as a whole does not indicate that Tanner has a fingering and handling limitation greater than that found by the ALJ. The Court so finds for three reasons.

First, notwithstanding Tanner's testimony that she has "carpal tunnel in both of [her] wrists," there is no evidence she experiences the effects of the impairment in her left hand. On more than one occasion, she reported pain in her right hand but made little mention of pain in her left hand. Troxell specifically limited his diagnosis of carpal tunnel syndrome to Tanner's right hand and made no mention of carpal tunnel syndrome in her left hand. It may be that Tanner experiences tremors or "shakes" in her left hand, but there is no evidence they give rise to any work-related limitations.

Second, the medical evidence relevant to Tanner's ability to finger and handle with her right hand is minimal and unremarkable. Although the ALJ found the impairment to be severe, there are few medical findings to support the impairment. Troxell diagnosed carpal tunnel syndrome in Tanner's right hand and opined that she has a moderately decreased ability to handle, but the ALJ could and did discount the opinion because it appears to have been made on the basis of Tanner's self-reports. Moreover, the ALJ could and did discount the opinion because it is inconsistent with Troxel's own findings and observations, i.e., Troxel observed that Tanner had an unlimited range of motion in her hands and wrists, no tremors, a normal grip strength, and could hold a pen and write, touch fingertips to palm, oppose thumb to fingers, and pick up a coin.

Third, the non-medical evidence relevant to Tanner's ability to finger and handle with her right hand is also minimal and unremarkable. Tanner's daily activites were only moderately limited, and there is no evidence she used a splint or took medication as prescribed by one medical professional.

-10-

Tanner offers a third reason why her residual functional capacity was not properly assessed. She maintains the effects of her mental health problems were underestimated by the ALJ.

The medical evidence relevant to Tanner's mental health reflects that she sought help for her problems on a number of occasions between July of 2010 and July of 2013. See Transcript at 450-452 (07/07/2010), 453-455 (07/15/2010), 460-463 (01/28/2011), 529-532 (04/27/2012), 479-485 (05/18/2012), 581-583 (07/30/2012), 578-580 (08/27/2012), 551-555 (10/12/2012), 574-577 (10/31/2012), 571-573 (12/05/2012), 568-570 (03/06/2012), 566-567 (07/09/2013), 561-565 (07/24/2013). It is not necessary to catalog Tanner's every problem other than to note that they have been many. She was prescribed medication for her symptoms, medication that included alprazolam and lithium. She was occasionally assigned a Global Assessment of Functioning ("GAF") score, and the scores were routinely between forty and forty-five.

When Hester saw Tanner in June of 2012, Tanner reported that her "mood disorder symptoms include anger outbursts with physical aggression toward people and objects." See Transcript at 496. She reported, though, that she had been receiving treatment, and "[the] medications have helped a great deal." See Transcript at 496. Hester diagnosed, inter alia, a mood disorder, post-traumatic stress disorder, an anxiety disorder, and "schizotypal and borderline traits." See Transcript at 502. He assigned her a GAF score of fifty. With respect to the effects of her mental impairments on her adaptive functioning, he opined the following:

-11-

1. <u>How do mental impairments interfere with this person's day to day adaptive functioning</u>? …

The claimant is able to tend to her basic self care needs. She is able to drive short distances. She does some of the shopping but none of the bill paying. She does not participate in social groups.

2. <u>Capacity to communicate and interact in a socially adequate manner</u>? …

The claimant is able to communicate and interact in a socially adequate manner.

3. <u>Capacity to cope with the typical mental/cognitive demands of basic work-like tasks</u>?

The claimant appears to have the capacity to communicate in an intelligible and effective manner.

4. <u>Capacity to cope with the typical mental/cognitive demands of basic work-like tasks</u>?

The claimant is likely to be able to cope with the typical mental demands of basic work-like tasks if her progress continues with her mental health treatment.

5. <u>Ability to attend and sustain concentration on basic tasks</u>?

The claimant appears to have the ability to attend and sustain concentration on basic tasks.

6. <u>Capacity to sustain persistence in completing tasks</u>?

The claimant does appear to have the capacity to sustain persistence in completing tasks.

7. <u>Capacity to complete work-like tasks within an acceptable timeframe</u>?

The claimant does appear to have the capacity to complete work-like tasks within an acceptable timeframe unless the tasks exacerbate her pain issues.

<u>See</u> Transcript at 502-503. Hester believed Tanner gave adequate effort/cooperation

during the evaluation and believed the results were valid.

The non-medical evidence relevant to Tanner's mental health reflects that she spends time with others and has no problem getting along with family, friends, and neighbors but has difficulty handling stress and changes in routine. See Transcript at 404-406. She testified during the administrative hearing that she has been married for approximately thirty-three years and has one son. See Transcript at 268. She completed the eighth grade in school but did not finish the ninth grade because school was not going right for her and she had "a lot of family problems." See Transcript at 270. She testified that her mental health issues interfere with her ability to work, noting that they cause her to become confused and make errors. See Transcript at 288.

The ALJ found at step two of the sequential evaluation process that Tanner's severe impairments include depression, a bipolar disorder, a panic disorder, post-traumatic stress disorder, an anxiety disorder, and a pain disorder associated with medical and psychological factors. He assessed her residual functional capacity and found that she was limited to work involving "simple, routine tasks with supervision that is simple, direct, and concrete;" and "occasional contact with workers, supervisors, and the general public." See Transcript at 255. In making that finding, the ALJ accorded significant weight to Hester's opinion because it was based on a thorough evaluation but gave little weight to the GAF scores because they were of little significance in determining disability.

Substantial evidence on the record as a whole supports the ALJ's finding regarding

Tanner's mental impairments. Although Tanner experiences symptoms associated with depression and anxiety, the symptoms are amenable to medication if taken regularly. The ALJ could and did credit Hester's opinion that the effects of Tanner's mental impairments on her adaptive functioning are not so great as to be disabling. For instance, the ALJ could and did credit Hester's observation that Tanner appeared to have the capacity to complete work-like tasks within an acceptable timeframe unless the tasks exacerbate her pain issues. Tanner's daily activities also do not reflect a level of severity greater than that found by the ALJ. He noted and credited her testimony that she does not participate in social groups but noted that her poor work history undermines her credibility.

Tanner maintains that her GAF scores were wrongly dismissed on the ground that they are not a reliable measure of functional ability. It is true the ALJ accorded little weight to the GAF scores, but his decision to do so is not error. A GAF score, by its very nature, is imprecise and is simply a "subjective determination that represents the clinician's judgment of the individual's overall level of functioning." See Jones v. Astrue, 619 F.3d 963, 973 (8th Cir. 2010) [internal quotation omitted]. Assuming, arguendo, that such a score is a reliable measure of functional ability, Tanner's scores are not consistent with the observations and findings supporting the scores. Her condition changed over time, improving when she took her medication and becoming worse when she did not. Her scores, though, rarely changed; they stayed in the range of forty and forty-five.

Given the foregoing, there is substantial evidence on the record as a whole to

support the ALJ's findings. Accordingly, Tanner's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

     IT IS SO ORDERED this 18th day of March, 2016.

 

 

_____

UNITED STATES MAGISTRATE JUDGE